IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOE GARCIA, FERNANDO QUILES, | : | |
| and DALIA RIVERA MATIAS | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 12-0556 |
| | : | |
| 2011 LEGISLATIVE REAPPORTIONMENT | : | |
| COMMISSION and CAROL AICHELE, | : | |
| | : | |
| | : | |

**SURRICK, J.**                                                                                   APRIL _5_ , 2013

**MEMORANDUM**

Presently before the Court are Defendant 2011 Legislative Reapportionment Committee's Motion to Dismiss (ECF No. 20), Defendant Carol Aichele's Motion to Dismiss (ECF No. 35), and Plaintiffs Joe Garcia, Fernando Quiles, and Dalia Rivera Matias's Motion for a Preliminary Injunction (ECF No. 19). For the following reasons, Defendants' Motions will be granted and Plaintiffs' Motion will be denied. [1]

## I.      BACKGROUND

### A.      Pennsylvania's Legislative Reapportionment Scheme and Election Code

The Pennsylvania Constitution requires the reapportionment of the Commonwealth's districts every ten years following the federal decennial census. Pa. Const. art. II, § 17(a). A Legislative Reapportionment Committee ("LRC") is assembled pursuant to this mandate. *Id.* The LRC consists of five members, four of whom shall be the majority and minority leaders of the Commonwealth's House of Representatives and Senate, or deputies appointed by each of

---

[1] There were two related actions, *Smith v. Aichele*, No. 12-488 (filed Jan. 30, 2012), and *Pileggi v. Aichele*, No. 12-588 (filed Feb. 2, 2012). On March 30, 2012, the plaintiffs in *Smith v. Aichele* voluntarily dismissed the case. (ECF No. 28.) On May 31, 2012 the plaintiffs in *Pileggi v. Aichele* also voluntarily dismissed the case. (ECF No. 22.)

them, and a selected chairman. *Id.* § 17(b). The LRC is charged with the duty of composing districts that are compact and contiguous, nearly equal in population, and without unnecessary divisions of counties and municipalities. *Id.* § 16.

A preliminary reapportionment plan must be filed by the LRC no later than ninety days from the date on which the LRC becomes duly certified, or the population data for the Commonwealth as determined by the federal decennial census becomes available, whichever is later in time. *Id.* § 17(c). The LRC has thirty days after filing the plan to make any corrections and the public has that same thirty day period to file exceptions to the plan. *Id.* Following the filing of any exceptions, the LRC has thirty days to consider those exceptions and revise the preliminary plan accordingly. *Id.* If no exceptions are filed within that thirty-day period, or if filed and acted upon, the reapportionment plan becomes final and has the force of law. *Id.* After the plan becomes final, any aggrieved person may file an appeal from the plan with the Pennsylvania Supreme Court within thirty days. *Id.* § 17(d). If an appellant establishes that a final plan is contrary to law, the Supreme Court remands the plan to the LRC, directing the LRC to reapportion the Commonwealth in a manner not inconsistent with the Court's order. *Id.* Once the Pennsylvania Supreme Court has decided any appeals, or when the last day for filing an appeal has passed with no appeals taken, the reapportionment plan has the force of law and the districts provided in the plan are used in elections to the General Assembly until the next required reapportionment. *Id.* § 17(e).

In a presidential election year, the general primary must be held on the fourth Tuesday in April. 25 Pa. Stat. Ann. § 2753(a). In 2012, the primary was held on April 24th. Candidates for all offices to be filled at the ensuing general election are nominated in this primary. *Id.* Pursuant

to the Pennsylvania Constitution, the general election is held on the Tuesday following the first Monday of November in each even-numbered year.  Pa. Const. art. VII, § 2.  Accordingly, the general election took place on November 6, 2012.  All of the seats in the House of Representatives and one-half of the State Senate seats were selected in the 2012 general election. All 203 seats in the House will again be up for election in November 2014.  The Senate seats selected in 2012 are not up for election again until 2016.  (Pls.' Supp. Mem. 17., ECF No. 63.)

### B.    The 2011 Reapportionment Plan

On April 19, 2011, the LRC was certified pursuant to Article 2, Section 17(a) of the Pennsylvania Constitution.  (Pls.' Resp. to Aichele 3, ECF No. 46.)  The members of the LRC are Senate Majority Leader Dominic Pileggi, Senate Minority Leader Jay Costa, House Majority Leader Mike Turzai, and House Minority Leader Frank Dermody.  *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 719 (Pa. 2012).  The Pennsylvania Supreme Court appointed the Honorable Stephen J. McEwen, Jr., President Judge Emiritus of the Superior Court of Pennsylvania as chairman of the LRC.  *Id.*

On March 9, 2011, the United States Census Bureau released its 2010 census data for Pennsylvania.  (Pls.' Resp. to Aichele 4.)  The data had to be processed by Legislative Data Processing Center and a private contractor, Citygate GIS, before it could be used.  *See Holt*, 38 A.3d at 719.  The census data did not become available in "usable" form until August 17, 2011. *Id*.  Defendant LRC argues that this triggered the ninety-day period for filing a preliminary redistricting plan.  (LRC's Reply 6, ECF No. 47.)[2]  Following public hearings in Allentown and

---

[2] Plaintiffs contend that the ninety-day period was triggered on April 19, 2011, the date the LRC was duly certified.  (Pls.' Resp. to Aichele 3-4.)

Pittsburgh, the LRC announced a preliminary redistricting plan on October 31, 2011.  *Holt*, 38 A.3d at 720.  Public hearings were held in Harrisburg on November 18 and 23, 2011 to entertain citizens' comments and objections to the preliminary redistricting plan.  *Id.*  A Final Plan was approved by the LRC on December 12, 2011.  *Id.*

Following the approval of the 2011 Final Plan, twelve appeals were filed with the Pennsylvania Supreme Court challenging the constitutionality of the plan, and preventing the plan from having the force of law.  *Id.*  The court heard oral argument on the appeals on January 23, 2012.  *Id.*at 720-21.  On January 25, 2012, the court issued a *per curiam* order declaring that the final 2011 Plan was contrary to law.  *Id.* at 715-16.  The court remanded the matter to the LRC with orders to reapportion the Commonwealth in a manner consistent with the court's opinion.  The opinion was filed on February 3, 2012.  *Id.*  The court also declared that the 2001 Legislative Reapportionment Plan ("2001 Plan") "would remain in effect until a revised final 2011 Legislative Reapportionment Plan having the force of law is approved."  *Id.* at 716.

The LRC's Revised Preliminary Plan was filed on April 12, 2012, with the Pennsylvania Department of State.  (Pls.' Supp. Mem. 12.)  On June 8, 2012, after hearings, a Final Reapportionment Plan (the "2012 Plan") was issued by the LRC.  (*Id.*)  Thirteen appeals were filed with regard to the 2012 Plan.  (*Id.*)  The Supreme Court consolidated these appeals under one caption, *In Re: Petitions for Review Challenging the Final 2011 Reapportionment Plan Date June 8, 2012*, Nos. 126-134 MM 2012, 39-42 WM 2012.  (*Id.*) [3]  Oral argument was held on these appeals on September 13, 2012.  (Aichele's Reply 4-5, ECF No. 49.)  As of this date, the

---

[3] Plaintiffs did not file an appeal with the Pennsylvania Supreme Court challenging the validity of the 2012 Plan, nor do Plaintiffs object to the 2012 Plan in this action.  (Jan. 11, 2013 Hr'g Tr. 42, ECF No. 61.)

Supreme Court has not issued an opinion.  The 2012 primary election and the general election were both conducted under the 2001 Plan.  (Pls.' Resp. to Aichele 6.)

### C.    Procedural History

#### 1.    Plaintiffs' Complaint

On February 2, 2012, Joe Garcia, Fernando Quiles, and Dalia Rivera Matias, registered Latino voters, filed the instant action against the 2011 LRC and Carol Aichele in her official capacity as Secretary of the Commonwealth of Pennsylvania.  (Compl. ¶¶ 1, 10, 12, ECF No. 1.) Plaintiffs Joe Garcia and Fernando Quiles reside in Philadelphia, Pennsylvania in the current 180th House District, and the current 2nd Senatorial District.  (*Id.* at ¶¶ 7-8.)  Plaintiff Dalia Rivera Matias resides in Allentown, Pennsylvania in the current 132nd House District and the 16th Senatorial District.  (*Id.* ¶ 9.)  Defendant 2011 LRC is charged with redistricting and reapportioning the Commonwealth's House and Senate Districts after each federal decennial census.  (*Id.* at ¶ 10.)  Defendant Carol Aichele, as Secretary of the Commonwealth, is Pennsylvania's Chief Election Officer and is responsible for overseeing elections in Pennsylvania.  (*Id.* at ¶ 12.)

In their Complaint, Plaintiffs contend that the 2001 Plan was malapportioned in light of the population shifts reflected in the 2010 federal decennial census.  Based on the 2010 census, Plaintiffs claim that the ideal population for Pennsylvania State Senate districts is 254,048, and 62,573 for House districts.  (*Id.* at ¶ 35.)  Plaintiffs cite to four state legislative districts that are malapportioned:  (1) Senate District 44 in Berks, Chester, and Montgomery Counties is over-populated by 34,626 persons, representing a deviation of 13.63 percent; (2) Senate District 38 in Allegheny and Westmoreland Counties is under-populated by 40,058 persons, or 15.77 percent; (3) House District 13 in Chester and Lancaster Counties is over-populated by 15,204 persons, or

24.3 percent; and (4) House District 24 in Allegheny County is under-populated by 11,569

persons, or 18.49 percent.  (*Id.* at ¶¶ 36-37.)  All told, the deviation from the ideal district size

under the 2001 Plan for the Senate is 29.4 percent, and 42.79 percent for the House.  (*Id.*)

  Plaintiffs also maintain that under the 2001 Plan, Latino voting strength is diluted.  (*Id.* at

¶¶ 39-49.)  Plaintiffs point to the substantial growth in the Latino population in Pennsylvania.

(*Id.* at ¶ 23.)  The results from the 2010 census reveal that Latinos comprise 5.7 percent of the

Commonwealth's total population.  (*Id.* at ¶ 24.)  The Latino community represents over 12

percent of the Philadelphia's population, or 187,611 people.  (*Id.* at ¶ 25.)  The Latino population

has grown by more than 45 percent in Philadelphia, outpacing the overall growth rate of the city.

(*Id.* at ¶ 26.)   In Allentown, Latinos comprise 42.8 percent of the city's population, and in

Reading, 58.2 percent of the city's population.  (*Id.*)  Plaintiffs argue that Latino political

representation has not kept pace with the rapid growth in the Latino population.  (*Id.* at ¶ 29.)

Plaintiffs cite to the fact that there is only one majority Latino House district, the 180th in

Philadelphia, and no majority Latino Senate districts.  (*Id.* at ¶ 28.)  Plaintiffs argue that the

"Latino community of Philadelphia County is sufficiently geographically compact to comprise a

majority of persons in two House legislative districts," allowing Latino voters the opportunity to

elect candidates of their choice.  (*Id.* at ¶¶ 39-40.)  Plaintiffs make similar claims with respect to

the Latino communities in both Berks and Lehigh Counties.  (*Id.* at ¶¶ 41-44.)

  Based on the alleged malapportionment, and the substantial growth in the Latino

population, Plaintiffs assert violations of the "one person, one vote" principle under the Equal

Protection Clause of the Fourteenth Amendment of the United States Constitution (Count I), and

a violation of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 (Count

II).  (*Id.* at ¶¶ 50-53.)

In order to remedy the constitutional and statutory violations, Plaintiffs seek the following relief:  (1) a declaratory judgment that the existing Pennsylvania legislative districts are malapportioned, illegally dilute the voting rights of Latinos in Pennsylvania, and are unlawful, null and void; (2) a permanent injunction barring Defendants from calling, holding, supervising, or certifying any elections under the 2001 Plan; (3) a reasonable deadline for Defendants and appropriate state authorities to enact or adopt a redistricting plan that is not malapportioned and does not dilute Latino voting strength; and (4) in the event that Defendants and appropriate state authorities fail to enact valid State legislative redistricting plans, for this Court to order, through a Special Master, new plans that are not malapportioned and do not dilute Latino voting strength.  (Compl. 10.)

### 2.    *Motion for Temporary Restraining Order*

On February 6, 2012, Plaintiffs filed a Motion for Temporary Restraining Order seeking to enjoin Defendant Aichele from "calling, holding, supervising or certifying the April 24, 2012 primary election on the basis of the 2001 Legislative Reapportionment Plan."  (Pls.' TRO ¶ 1, ECF No. 2.)  Plaintiffs also requested that this Court convene a three-judge panel pursuant to 28 U.S.C. § 2284.  (*Id.*)

On February 8, 2012, we filed a Memorandum and Order (ECF Nos. 10, 11) denying Plaintiffs' Motion.  With an impending primary election only eleven weeks away, we concluded that the use of the 2001 Plan in the 2012 elections was permissible.  *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 594-95 (E.D. Pa. 2012).  In addition, we determined that Plaintiffs were not entitled to a three-judge panel, as the requested injunctive relief was not a "reasonable option." *Id.* at 597.

###### 3.      *Motion for Preliminary Injunction and Motions to Dismiss*

On June 29, 2012, after the unsuccessful attempt to enjoin the 2012 elections, Plaintiffs filed a Motion for Preliminary Injunction.  (Pls.' Mot. for Prelim. Inj., ECF No. 19.)  Plaintiffs request:  (1) a shortened one year election term for any state legislators elected in 2012 under the 2001 Plan; and (2) a special election to be held in 2013, so that legislators can be elected under an approved 2011 Legislative Reapportionment Plan, which more accurately reflects the populations shifts that have occurred in Pennsylvania.  (*Id.* at 1.)

In response to this Motion, Defendant LRC filed a Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction on August 15, 2012.  (LRC's Resp. to Prelim. Inj., ECF No. 41.)  On September 7, 2012, Plaintiffs filed a Reply Memorandum of Law in Further Support of Plaintiffs' Motion for a Preliminary Injunction.  (Pls.' Reply, ECF No. 48.)

On July 2, 2012, Defendant LRC filed a Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) (ECF No. 20) and a Memorandum of Law in support thereof.  (LRC's Br., ECF No. 21.)  On August 15, 2012, Plaintiffs filed a Memorandum of Law in Opposition to Defendant LRC's Motion to Dismiss.  (Pls.' Resp. to LRC., ECF No. 40.)  Defendant LRC filed a Reply Brief in Further Support of its Motion to Dismiss on September 7, 2012.  (LRC's Reply, ECF No. 47.)

On August 13, 2012, Defendant Aichele also filed a Motion to Dismiss, (Aichele's Mot., ECF No. 35) and a Memorandum of Law in support thereof.  (Aichele's Br., ECF No. 36.)  On September 7, 2012, Plaintiffs filed a Memorandum of Law in Opposition to Defendant Aichele's Motion to Dismiss Plaintiffs' Complaint and in Further Support of Plaintiffs' Motion for a Preliminary Injunction.  (Pls.' Resp. to Aichele.)  Defendant Aichele filed her Reply Brief in Further Support of her Motion to Dismiss on September 20, 2012.  (Aichele's Reply.)

On January 11, 2013, a hearing was held on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions to Dismiss.  (Min. Entry, ECF No. 59.) [4]  On January 25, 2013, Plaintiffs submitted a Supplemental Memorandum of Law specifically addressing issues raised at the hearing, including:  the appointment of a special master in connection with Plaintiffs' request for a special election; and arguments raised by amicus curiae Senator Pileggi.  (Pls.' Supp. Mem.)  Plaintiffs also renewed their request for the convening of a three-judge panel.  (*Id.*)

On February 7, 2012, Defendant Aichele filed a Memorandum of Law in Response to Plaintiffs' Supplemental Memorandum.  (Aichele's Resp. to Supp. Mem., ECF No. 64.) Defendant LRC also filed a Brief in Opposition to Plaintiffs' Supplemental Memorandum on February 8, 2013.  (LRC's Resp. to Supp. Mem., ECF No. 68.)[5]

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), "a pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief."  When evaluating a Rule 12(b)(6) motion "courts [must] accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009*)* (quoting *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  In order to survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[4]  This hearing was originally scheduled for November 1, 2012.  (ECF No. 58.)  The hearing was continued because of the unavailability of counsel as a result of Hurricane Sandy.  The schedules of counsel prevented the rescheduling before January 11, 2013.

[5]  We permitted Senator Dominic Pileggi, Representative Michael Turzai, and Senator Jay Costa to file memoranda as amicus curiae in this case.

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  "Where the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'"  *Iqbal,* 129 S.Ct. at

1949.

The court "must accept all of the complaint's well-pleaded facts as true, and may

disregard any legal conclusions."  *Fowler*, 578 F.3d at 210-11.  The court is not required to

accept '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements . . . ."  *Wilson v. City of Philadelphia*, 415 F. App'x 434, 436 (3d Cir. 2011) (quoting

*Iqbal*, 129 S.Ct. at 1949).

## III.    DISCUSSION

Plaintiffs acknowledge that the 2012 election had to proceed under the 2001 Plan "given

the public interest in an orderly election process."  (Pls.' Mot. for Prelim. Inj. 10.)   Despite this

concession, Plaintiffs assert that the use of the 2001 Plan in the 2012 election violated Plaintiffs'

rights to equal representation under the Equal Protection Clause, and unlawfully diluted Latino

voting strength.  (*Id.*)  Plaintiffs argue that the results of the 2012 election cannot be "allowed to

stand until the next regularly scheduled election in 2014 given the persistent malportionment

[sic] among voting districts. . . ."  (*Id.*)  Plaintiffs request that we implement one of the following

plans to address the alleged constitutional and statutory violations:

> (1) Order state legislators elected in 2012 to serve a shortened one-year term and
> convene a special election to properly elect legislators to these positions
> pursuant to an approved 2011 Legislative Reapportionment Plan in
> conjunction with the May 21, 2013 municipal state primary and the November
> 5, 2013 municipal election. If there is no legally valid 2011 reapportionment
> plan by March 1, 2013, appoint a special master or assign a United States

10

Magistrate Judge to oversee the reapportionment process in time to produce a plan by upcoming candidate-petitioning deadlines for the 2013 municipal election, slated between February 19, 2013 and March 12, 2013.

(2) Order state legislators elected in 2012 to serve a shortened one-year term and convene a special election to properly elect legislators to these positions pursuant to an approved 2011 Legislative Reapportionment Plan in conjunction with a standalone special election primary to be held after the February 19, 2013 municipal primary, followed by a special general election held in connection with November 5, 2013 general municipal elections. If there is no legally valid 2011 reapportionment plan by March 1, 2013, appoint a special master or assign a United States Magistrate Judge to oversee the reapportionment process in time to produce a plan by a delayed candidate petitioning period corresponding with the standalone special election primary scheduled.

(3) Order state senators elected to oddly numbered districts in 2012 to serve a shortened two-year term and convene a special election to properly elect senators to these districts pursuant to an approved 2011 Legislative Reapportionment Plan in connection with the 2014 legislative election. Those elected to oddly numbered senate districts in 2014 would serve a shortened two-year term to be followed by regularly scheduled legislative elections in 2016. If there is no legally valid 2011 reapportionment plan by December 1, 2013, appoint a special master or assign a United States Magistrate Judge to oversee the reapportionment process in time to produce a plan by the applicable 2014 candidate-petitioning period. Under this alternative remedy, House representatives elected in 2012 would be allowed to serve out their full term, despite the unconstitutionality of their election, with elections for new house terms to occur in 2014 as regularly scheduled.

(Pls.' Supp. Mem. 18-20.)

Defendant Aichele responds that because the Commonwealth is complying with a reasonably conceived plan for periodic readjustment of legislative reapportionment, Plaintiffs' Complaint fails to state a claim for which relief can be granted under the Equal Protection Clause. (Aichele's Br. Section III.A.) [6] Defendant Aichele also argues that because there is no constitutional violation, this Court need not consider any of the remedial relief requested by

---

[6] Defendant LRC also filed a Motion to Dismiss. The Motions substantially overlap.

11

Plaintiffs, and that in any event, such relief would be harmful and disruptive to the electoral

process.  (Aichele's Resp. to Supp. Mot. Section B.)

> A.    **Equal Protection Clause**
>
>> 1.    *Use of the 2001 Plan in the 2012 Election*

The one person, one vote principle of the Equal Protection Clause requires legislative

districts to be as equal in population as is practicable, so as to ensure substantially equal

legislative representation for all citizens.  *Reynolds v. Sims*, 377 U.S. 533, 568, 577 (1964).  The

Supreme Court in *Reynolds* recognized, however, that under certain limited circumstances, an

apportionment scheme that does not comply with the "one person, one vote" mandate because of

the passage of time may still be used without violating the Constitution.  The Court stated that:

> Decennial reapportionment appears to be a rational approach to readjustment of
> legislative representation in order to take into account population shifts and
> growth. Reallocation of legislative seats every 10 years coincides with the
> prescribed practice in 41 of the States . . . . Limitations on the frequency of
> reapportionment are justified by the need for stability and continuity in the
> organization of the legislative system, although undoubtedly reapportioning no
> more frequently than every 10 years leads to some imbalance in the population of
> districts toward the end of the decennial period and also to the development of
> resistance to change on the part of some incumbent legislators. In substance, we
> do not regard the Equal Protection Clause as requiring daily, monthly, annual or
> biennial reapportionment, so long as a State has a reasonably conceived plan for
> periodic readjustment of legislative representation. While we do not intend to
> indicate that decennial reapportionment is a constitutional requisite, compliance
> with such an approach would clearly meet the minimal requirements for
> maintaining a reasonably current scheme of legislative representation.

*Id.* at 583-84.

In applying the standard set forth in *Reynolds*, federal courts have recognized that no

constitutional violation exists when an outdated legislative map is used, so long as the defendants

comply with a reasonably conceived plan for periodic reapportionment.  For example, in

*Political Action Conference of Illinois v. Daley*, the Seventh Circuit held that the use of 1980

census data in Chicago's 1991 aldermanic election was valid under the standard set forth in *Reynolds*. 976 F.2d. 335, 340 (7th Cir. 1992). The court stated that the Illinois statutory scheme for decennial reapportionment did not result in a constitutional violation, despite some probable "imbalance" in district populations toward the end of the decennial period. *Id.* (quoting *Reynolds*, 377 U.S. at 583.) Thus, the validity of the 1991 election under 1980 census data, depended on the "existence of a reasonably conceived plan for periodic readjustment of legislative representation." *Id.* at 339 (quoting *Reynolds*, 377 U.S. at 583.)

Similarly, in *Graves v. City of Montgomery*, an Alabama district court dismissed Plaintiffs' Equal Protection and Voting Rights Act claims. 807 F. Supp. 2d 1096 (M.D. Ala. 2011). The defendants claimed that allowing the 2011 city council elections to proceed under the 2001 apportionment plan would deny the plaintiffs' constitutional right to equal protection under the law. *Id.* at 1102. Citing both *Reynolds* and *Daley*, the court concluded that if the defendants are "complying with a reasonably conceived plan that results in decennial reapportionment of the City's city council districts . . . they satisfy 'the minimal requirements for maintaining a reasonably current scheme of legislative representation,' under the Equal Protection Clause." *Id.* at 1110 (quoting *Reynolds*, 377 U.S. at 583-84.) Ultimately, the court concluded that the use of the 2001 Plan in the 2011 city council election did not violate the plaintiffs' rights to equal protection. *Id.* at 1112.

Here, Pennsylvania has a decennial reapportionment plan in place to reconfigure the Commonwealth's legislative districts, pursuant to Section 17, Article II of the Pennsylvania Constitution. Plaintiffs do not contest the constitutionality of Pennsylvania's legislative reapportionment scheme. Rather they argue that Defendant LRC has failed to properly execute its duties in a timely fashion and that such delay deprived Plaintiffs of a constitutionally

reapportioned plan for the 2012 election.  (Pls.' Resp. to Aichele Section I.a.)  Specifically, Plaintiffs argue that Defendants missed the deadline for filing a preliminary reapportionment plan.  (*Id.* at 10.)  Plaintiffs claim that the ninety-day period for filing a preliminary plan was triggered when the LRC was commissioned on April 19, 2011, which means that the plan should have been filed by July 18, 2011.  (*Id.*)  Defendant LRC contends that the ninety-day period was triggered by the release of usable census data on August 17, 2011, thus making the October 31, 2011 release of the preliminary plan well within the ninety-day deadline.  (LRC's Reply 6.)

Plaintiffs cite *Flateau v. Anderson*, 537 F. Supp. 257 (S.D.N.Y. 1982), in support of their contention that the LRC's delay resulted in a violation of their rights to equal protection.  (Pls.' Resp. to Aichele 14-16.)  In *Flateau*, certain New York state officials charged with legislative reapportionment argued that it was constitutionally permissible to delay reapportionment of state legislative districts for six years after the release of census data.  537 F. Supp. at 262-63.  The court noted that, absent judicial intervention, New York would not have begun the reapportionment process.  *Id.* at 262.  The defendants offered no compelling justifications for the delay, except to say that it was based on New York State "tradition."  *Id.* at 265.  The court concluded that it need not defer to the state's tradition, because the defendant failed to show that the delayed reapportionment was an "expression of significant state interests or concerns."  *Id.*

*Flateau* is easily distinguished.  In New York, it had been two years since the federal decennial census, and state officials had not taken any steps to reapportion the state's legislative districts.  By contrast, the LRC has actively been in the process of reapportioning since at least the release of usable data on August 17, 2011.  Even if, as Plaintiffs contend, the LRC failed to meet the deadline for filing a preliminary reapportionment plan, Plaintiffs do not contend that the

14

LRC intentionally delayed the process.  The LRC did not refuse to begin the reapportionment process, as the defendants did in *Flateau*.

In *Clark v. Marx*, a district court addressed a similar challenge to a delayed reapportionment plan.  No. 11-2149, 2012 U.S. Dist. LEXIS 2429 (W.D. La. Jan. 9, 2012).  The legislative reapportionment scheme in *Clark* required the City of Monroe, Louisiana to reapportion their city council districts no later than one year following the publication of the federal decennial census, and at least six months prior to the next election of city council members.  *Id.* at *8.  The defendants failed to pass a reapportionment plan within the six months prior to the next election deadline, and thus pursuant to the legislative reapportionment scheme, the current city council members remained in office until the next regularly scheduled election.  *Id.* at *25-26.  The plaintiffs argued that the defendant's failure to meet this deadline and the continued representation by city council members over malapportioned electoral districts constituted a violation of equal protection.  *Id.* at *26.  The court held that even though the "City Council did not meet the short six-months-before-the-next-election deadline set forth in the City Charter, the City Council's violation of its own Charter provision is not of constitutional concern."  *Id.* at *31.  Significantly, the court stated that the Equal Protection Clause requires "a reasonably conceived plan for periodic reapportionment, not that the plan be executed perfectly."  *Id.* at *29.   The court found that the city did in fact have a reasonably conceived plan, and despite the delay in execution, the city council had fulfilled their duties under that plan.  *Id.* at *31.

Pennsylvania has a reasonably conceived plan for periodic reapportionment.  Notwithstanding the brief delay of Defendants in executing their duties under the plan, they have fully complied with the law.  *See Pileggi*, 843 F. Supp. 2d at 594 ("There is no indication that the

Commonwealth has adamantly refused to comply with constitutional mandates and court orders. To the contrary, the LRC has complied with the law, albeit slowly. . . .").  Defendant LRC filed its Final Reapportionment Plan on June 8, 2012.  The LRC has completed its duties under the Article II, Section 17 of the Pennsylvania Constitution.  The Final Reapportionment Plan is now before the Supreme Court of Pennsylvania.  We assume that the Supreme Court will do its job with alacrity.  We are satisfied that the use of the 2001 Plan in the 2012 elections presents no constitutional violation.[7]

### 2.    *Special Election*

Plaintiffs further contend that the Equal Protection Clause requires the Commonwealth to conduct special elections for those legislators elected under the malapportioned 2001 Plan.  We disagree.  As previously discussed, no constitutional violation resulted from the use of the outdated plan in the 2012 general election.  Given the absence of a constitutional injury, there is no need for this Court to order a special election.  Moreover, we agree with Defendants that a special election is a drastic remedy and one that would disrupt the orderly electoral process contemplated by the Pennsylvania Constitution.  We will not intervene at this time in what is primarily a legislative matter.  *See Reynolds*, 377 U.S. at 586 ("[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and [] judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in timely fashion after having had an adequate opportunity to do so.").  Defendant LRC has complied with Pennsylvania's constitutionally acceptable legislative reapportionment scheme.  A Final Reapportionment Plan is presently being reviewed by the Supreme Court of Pennsylvania.  Judicial intervention by this Court at this juncture would be inappropriate.

---

[7] Clearly the 2001 Plan cannot be used in the 2014 election.

The district court opinion in *Ramos v. State of Illinois* is particularly instructive on this issue. 781 F. Supp. 1353 (N.D. Il. 1991), *aff'd sub nom Daley*, 976 F.2d at 335. In *Ramos*, the plaintiffs sought to enjoin the 1991 Chicago aldermanic elections from proceeding under an outdated aldermanic map. *Id*. at 1354. The court denied the relief and the plaintiffs filed a second amended complaint requesting that the court devise a new map based on current census figures and conduct special elections based on the new map. *Id*. The court again denied the plaintiffs' requests, concluding that a special election was unwarranted despite the malapportioned map. *Id.* at 1356-57. In reviewing the standard set forth in *Reynolds*, the court concluded that Illinois had a "rationally conceived plan, tied to the decennial census," and thus there was no constitutional violation. *Id.* at 1357.

The Sixth Circuit, under similar circumstances, in the case of *French v. Boner*, also concluded that a special election was not constitutionally mandated. 963 F.2d 890, 892 (6th Cir. 1992). The question before the court was whether the Equal Protection Clause required the city of Nashville to conduct new elections for local legislators elected under an outdated and malapportioned plan. *Id.* at 891. The court determined that considerations such as the "settled expectations that both voters and elected officials hold as a result of the election," the validity of four-year terms of office, the costs of elections, and "the need for stability and continuity of office" outweighed the "consideration of mathematical equality in representation." *Id*. at 892.

Since a reasonably conceived plan of decennial reapportionment is sufficient to guarantee the constitutionality of the 2012 election, we see no need to disturb the settled expectations of both voters and elected officials by ordering the requested special election.

**B.      Voting Rights Act**

17

In Count II of the Complaint, Plaintiffs also bring a claim asserting a violation of Section 2 of the Voting Rights Act.  (Compl. ¶¶ 52-53.)  Plaintiffs contend that the "current Pennsylvania House legislative districts result in a denial or abridgment of [sic] right to vote of Plaintiffs on account of their race, color or ethnicity, by having the effect of cancelling out or minimizing their individual voting strength as minorities in Pennsylvania."  (*Id.* at ¶ 53.)  According to Plaintiffs, the use of the 2001 plan does not afford "Plaintiffs an equal opportunity to participate in the political process and elect candidates of their choice and denies them the right to vote in elections in violation of 42 U.S.C. Section 1973."  (*Id.*)

A similar Voting Rights Act claim was rejected by the court in *Ramos*. 781 F. Supp. at 1354 *aff'd sub nom Daley*, 976 F.2d at 335.  The plaintiffs argued that the use of an outdated legislative map "violat[ed] the rights of Hispanic voters because a substantial increase in the number of Hispanic citizens in Chicago [would] not be recognized" in the aldermanic elections. *Id*.  The district court held that the standard of decennial reapportionment established in *Reynolds* was the appropriate standard to be applied in the context of the Voting Rights Act.  *Id*. at 1356 ("Reapportionment following a decennial census is the constitutional norm, and we are not aware of anything that suggests that Congress intended to change [the *Reynolds*] standard for the purposes of the Voting Rights Act.").  The court went on to dismiss the Voting Rights Act claim, applying the *Reynolds* standard.  *Id.* at 1357 ("[W]e believe that the Illinois statutory scheme is a rationally conceived plan, tied to the decennial census, to accomplish the necessary periodic adjustment.").

On appeal, the Seventh Circuit affirmed that *Reynolds* set the standard for resolving Voting Rights Acts Claims.  *Daley*, 976 F.2d at 339 ("The plaintiffs' complaint questions whether this statutory scheme violates the Voting Rights Act or constitutional norms? [sic] The

Supreme Court set out the standard to resolve this question in *Reynolds v. Sims*.").  The Seventh Circuit affirmed the district court's dismissal, and rejected the plaintiffs' Voting Rights Act claim.  *Id*. at 340.   The court held that the plaintiffs' assertion that a legislative map had become discriminatory due to shifts in minority populations was "not the stuff of a Voting Rights Act violation."  *Id*.  The court reasoned that Chicago was not required to change "its legitimate decennial redistricting scheme or change its customary four-year term length for aldermen in order to avoid the predictable and temporary delay that occurs once every twenty years in implementing the new census figures."  *Id.* at 341.

Like the Seventh Circuit, we conclude that the facts alleged fail to state a claim under the Voting Rights Act.  The standard set forth in *Reynolds* requires a "reasonably conceived plan for periodic readjustment of legislative representation."  *Reynolds*, 377 U.S. at 583.  Pennsylvania has such a plan, and despite the alleged delay in implementation, the LRC has fulfilled its duties under the legislative reapportionment scheme.  *See Pileggi*, 843 F. Supp. 2d at 594 ("There is no indication that the Commonwealth has adamantly refused to comply with constitutional mandates and court orders.  To the contrary, the LRC has complied with the law, albeit slowly. . . .").  Plaintiffs' allegations are insufficient to state a plausible claim for violation of the Equal Protection Clause or the Voting Rights Act.  Accordingly, we are compelled to dismiss Plaintiffs' Complaint.

### C.    Three-Judge Panel

Plaintiffs have renewed their request for a three-judge panel.  (*See* Pl.'s Supp. Mot. 3.) We previously denied Plaintiffs' initial request for a three-judge panel, stating that the injunctive relief requested at the time—intervention by this Court to stop Defendant from moving forward with the April 24, 2012 primary election process—was not a reasonable option.  *Pileggi*, 843

F.Supp. 2d at 597.  Again, we find Plaintiffs' requested relief—a special election—to be

unwarranted, and thus Plaintiffs are not entitled to a three-judge panel.

Under 28 U.S.C § 2284(a), a district court of three judges shall be convened when an

action is filed "challenging . . . the apportionment of any statewide legislative body."  A single

judge, unless he determines that three judges are not required, cannot "hear and determine any

application for a preliminary or permanent injunction . . . or enter judgment on the merits."  28

U.S.C. § 2284(b)(3).  A single district court judge may decline to convene a three-judge panel if

he or she finds that the constitutional challenge to the apportionment scheme is "legally frivolous

and insubstantial."  *Page v. Bartels*, 248 F.3d 175, 191 (3d Cir. 2001).  "Insubstantiality in the

claim may appear because . . . injunctive relief is [] unavailable."  *Md. Citizens for a*

*Representative Gen. Assembly v. Governor of Md.*, 429 F. 2d 606, 611 (4th Cir. 1970).

Plaintiffs' claims here are insubstantial.  Under the principles set forth in *Reynolds*, and

its progeny, the 2012 election proceeded in a manner consistent with the Constitution.  Plaintiffs

have failed to demonstrate a violation of either the Equal Protection Clause or the Voting Rights

Act.  Therefore, Plaintiffs are not entitled to judicial relief.  Since judicial relief is unavailable,

this Court can properly dismiss these claims without convening a three-judge court. *See*

*Duckworth v. State Admin. Bd. of Election Laws*, 332 F.3d 769, 772-73 (4th Cir. 2003) ("If, as

the district court concluded, [the plaintiff's] pleadings do not state a claim, then by definition

they are insubstantial and so properly are subject to dismissal by the district court without

convening a three-judge court.").

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motions will be granted, and Plaintiffs' motion will be denied.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARLCAY SURRICK, J.**